IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ZINDA APPLEWHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20 C 3214 |
| | ) | |
| ILLINOIS DEPARTMENT OF HUMAN SERVICES, GLENDA CORBETT, CHRISTINE McGEE, and DARRYL RADER, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Zinda Applewhite[1] has filed suit against her former employer the Illinois Department of Human Services (IDHS), as well as three IDHS supervisors, Glenda Corbett, Christine McGee, and Darryl Rader, alleging discrimination based on disability. The defendants have moved for summary judgment. For the reasons stated below, the Court grants defendants' motion.

**Background**[2]

Applewhite was employed with IDHS for eleven years and, at the time of her termination, worked at IDHS's Ludeman Development Center as a Residential Services

---

[1] The Court thanks Jerome F. Crotty of Rieck and Crotty, P.C. for his thorough and diligent service as appointed counsel for Ms. Applewhite.

[2] The factual record the Court considers when ruling on a motion for summary judgment is framed by the parties' Local Rule 56.1 statements and responses, although the Court retains discretion to "consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3).

Supervisor. Applewhite suffers from post-traumatic stress disorder, anxiety disorder, major depressive disorder, bipolar disorder, and schizophrenia. McGee and Rader both were employed by IDHS as Public Service Administrators at Ludeman during the relevant time-period. Corbett was employed by IDHS as a Senior Public Service Administrator.

On October 6, 2015, Applewhite went on a leave of absence from IDHS for an unspecific anxiety disorder. On January 5, 2016, McGee and Corbett were on an email thread where they acknowledged that Applewhite requested medical leave in September 2015 for "panic disorder/attacks" and discussed if they had a valid basis for finding her unfit for duty. Pl.'s Resp. Ex. 7. On April 22, 2017, Applewhite went on FMLA leave.

On September 25, 2018, Applewhite sought an accommodation in the form of a new supervisor and work environment. Applewhite's doctor approved her to return to work on February 21, 2019 "without any restrictions." Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 19. On March 4, 2019, Applewhite's request for an accommodation was denied. She was told the ADA does not cover a "new supervisor and work environment as a reasonable accommodation" but that she could seek "vacant positions through the bid process." *Id.* ¶ 21. The response took note that Applewhite "returned to work without any restrictions on February 21, 2019 from a continuous non-service connected disability leave of absence (LOA), which began on April 20, 2017." *Id.*

On September 11, 2019, Applewhite and another IDHS employee she occasionally supervised, Janessa Cross, got into a physical altercation. Applewhite was arrested on a charge of battery, but the charge was later dropped, and her record was

eventually expunged. Cross was not arrested or charged.

An internal investigation of the incident was conducted by IDHS's Bureau of Internal Investigations. Applewhite, Cross, and Darlyngton Obomanu, an IDHS employee who witnessed the incident, all gave statements. Cross stated that during a testy verbal discussion, Applewhite approached her, and Cross held up her hand and said, "do not come near me." According to Cross, Applewhite slapped Cross's hand away and then punched her in the face, causing her to fall to the floor, and then got on top of her and kept hitting her. Cross said she defended herself by hitting back and that other staff pulled Applewhite off her. Applewhite, by contrast, said that Cross accosted her and got very close, and as both of them were saying "get out of my face," Cross slapped Applewhite's glasses off, Applewhite slapped her back, and they both fell to the floor. Obomanu's account was similar to Cross's. Obomanu stated that Applewhite approached Cross; Cross held her hands up and said "stay away from me"; Applewhite hit Cross's hands away and then hit her in the face; Cross tried to push Applewhite away; they both fell over, with Applewhite on top; and Obomanu pulled Applewhite off Cross and held her back while Cross went to call an administrator. The investigator found that Applewhite—and not Cross—had violated IDHS's workplace violence policy and that Applewhite had been the aggressor. *See* Defs.' Ex. 12.

The IDHS investigator issued his report on October 22, 2019. On October 28, a "pre-disciplinary/pre-termination" meeting was held with Applewhite, whose union representative was also present, and management representatives, including Rader. The report of the meeting states that at the meeting's conclusion, management recommended suspending Applewhite as of October 30 for thirty days, pending

3

discharge. *See* Defs.' Ex. 17. Applewhite's union representative filed a rebuttal to the recommendation on November 3. Lisa Robinson, Ludeman Center's Director, suspended Applewhite for thirty days effective November 8, pending discharge. Robinson found that Applewhite had violated various code of conduct rules, including the workplace violence rule. *See* Defs.' Ex. 18. Applewhite was terminated on December 7, 2019. It does not appear from the record that Cross was disciplined.

On January 22, 2020, Applewhite filed a charge of discrimination with the Illinois Department of Human Rights. She selected "disability" as the type of discrimination. The charge states:

> I started working for Respondent on or around October 2013. Respondent was made aware of my disability. During my employment I was terminated for an altercation I had with another co-worker when the other co-worker was not terminated. I believe I have been discriminated against because of my disability, in violation of the American with Disabilit[ies] Act of 1990, as amended.

Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 46. In her corresponding intake interview, an Equal Employment Opportunity Commission (EEOC) employee wrote in shorthand, "PCP is Bipolar-schizophrenia. R[espondent] is aware of CPs Disabil[it]y" and "CP feels that she has been so stressed due all the issues." Pl.'s Resp. Ex. 12 ("CP" appears to stand for "complaining party," i.e., Applewhite). The EEOC employee also took note that Applewhite alleged that defendants did not accommodate her disability and that she was terminated but her non-disabled co-worker was not.

On February 5, 2020, the EEOC issued Applewhite a notice of right to sue that Applewhite received on February 17, 2020. On March 4, 2020, Applewhite sought to be rehired by IDHS, but her request was denied.

According to Applewhite, sometime before May 2020 she visited the Dirksen

4

Courthouse during normal business hours to file the present lawsuit but was told by a security guard that the courthouse was closed for new filings for reasons related to the COVID-19 pandemic. Applewhite testified during her deposition that "I was a week before the deadline of the filing, and I went downtown with my papers, and that's when it was on the notice." Applewhite Dep. at 94:21-23. Applewhite testified that she saw notices in the courthouse, including on the Clerk's drop box, stating that the Court was not taking new case filings in person. Applewhite testified she was instructed by a security guard to visit the Court's website for more information on filing a new lawsuit. Applewhite testified that she learned she could file electronically if she completed an online training. She testified that she did the training a week before she filed her complaint and that it took her more than one day to get her complaint on file due to errors she made in the process that needed to be corrected. Applewhite described struggling with filing electronically the supporting paper documents she had compiled for her intended in-person filing. On May 29, 2020, Applewhite filed the present lawsuit.

On July 9, 2021, a labor arbitration hearing was held involving Applewhite's claim of wrongful termination. The hearing was not recorded or transcribed. The question presented at the arbitration was, "did the Employer have just cause to terminate the employment of the Grievant, Zinda Applewhite? If so, what is the appropriate remedy?" Defs.' L.R. 56.1 Stmt., Ex. 13 at 2. According to the arbitrator's order, issued in July 2021 after the filing of the present lawsuit, Obomanu testified and gave the same account he had provided to the IDHS investigator in 2019. Cross did not testify despite being subpoenaed. Another witness, Ofonmbuk Akpan, testified that Obomanu could not have seen the altercation because he was with Akpan, but the arbitrator did not find

Akpan's testimony to be credible. Applewhite maintained the story she had told previously, and the union backed Applewhite's version of the events. The burden of persuasion in the arbitration was on the employer, IDHS. The arbitrator found for IDHS, concluding there was just cause for Applewhite's termination.

The Court stayed proceedings in the present case during the pendency of the labor arbitration proceedings and ultimately appointed counsel to represent Applewhite in this case. Applewhite filed her operative complaint, the seventh amended complaint, on March 6, 2024. She asserts ADA claims against IDHS for disability discrimination based on her termination, failure to train, failure to accommodate, failure to rehire, and for maintaining a hostile work environment. Applewhite also asserts claims under 42 U.S.C. § 1983 against defendants Corbett, McGee, and Rader for violating her rights under the Equal Protection Clause of the Constitution's Fourteenth Amendment.

## Discussion

The defendants have moved for summary judgment on all of Applewhite's claims. A party is entitled to summary judgment if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court construes "all facts and draw all reasonable inferences in the nonmoving party's favor, but the moving party may prevail by showing an absence of evidence to support the nonmoving party's claims." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (internal quotation marks omitted).

**A.      Timeliness**

Defendants argue that Applewhite's ADA claims are time-barred because she failed to file her lawsuit within ninety days of receiving her notice of right to sue from the EEOC.

"Under the ADA a plaintiff must file suit within ninety days of receiving notice of his right to sue." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009). It is undisputed that Applewhite's complaint was not filed within the ninety-day period. Applewhite says she received her right to sue letter on February 17, 2020, and she filed her lawsuit on May 29, 2020, 102 days later.

Applewhite argues that equitable tolling is appropriate here, asserting that the delay was caused by court-imposed COVID-19 restrictions. According to Applewhite, she visited the Dirksen Federal Courthouse in April or May 2020 and was told she could not file her complaint in person. Applewhite testified that she had to spend time completing training on e-filing and learning how to input her materials on the Court's system before she was eventually able to file her complaint on May 29, 2020.

"The threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." *Lombardo v. United States*, 860 F.3d 547, 551 (7th Cir. 2017) (internal quotation marks and alterations omitted). Equitable tolling "is reserved for situations in which the claimant has made a good faith error (e.g., brought suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001).

It is undisputed that Applewhite's ninety-day filing deadline ran during the height of the COVID-19 pandemic. She has testified that she attempted to file her complaint in

person—within the ninety-day period—but was rebuffed by security personnel, who said in-person filing could not be done at the time. Defendants cite various versions of the court's General Order 20-0012 that were in effect and available online and that permitted pro se litigants to file new cases by emailing the Clerk's Office and also permitted pro se plaintiffs to file their complaints via the mail. On the other hand, Applewhite has testified that she was required to go through training before being allowed to e-file and that through no fault of her own she could not get this done within the ninety-day period.

The Court concludes that there is a genuine factual dispute regarding the application of equitable tolling. Specifically, there is evidence that Applewhite made a good faith and diligent effort to get her complaint on file on time but was prevented from doing so by impediments outside her control arising from the pandemic. For this reason, defendants are not entitled to summary judgment on the ADA claims on this particular basis.

**B.    Exhaustion**

Defendants argue that Applewhite failed to exhaust administrative remedies on all of her ADA claims except for her claim for wrongful termination. They point to the absence of any reference in her EEOC charge to her claims of failure to train, failure to accommodate, failure to rehire, and maintaining a hostile work environment. Applewhite argues that, as unrepresented individual at the time her charge was filed, the Court should read her EEOC charge to include these claims. Applewhite further asks the Court to consider the contents of her EEOC interview in determining what claims she presented to the agency.

A plaintiff asserting a claim under the ADA must exhaust administrative remedies by filing a charge with the EEOC before filing suit in court. *See Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018). "The primary purpose of the EEOC charge requirement is twofold: it gives the EEOC and the employer a chance to settle the dispute, and it gives the employer notice of the employee's grievances." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015). The scope of the EEOC charge "limits the scope of subsequent civil proceedings in federal court." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013).

On Applewhite's EEOC charge, she checked the box for disability discrimination. In support, the charge stated only the following:

> I started working for Respondent on or around October 2013. Respondent was made aware of my disability. During my employment I was terminated for an altercation I had with another co-worker when the other co-worker was not terminated. I believe I have been discriminated against because of my disability, in violation of the [ADA]

Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 46. In short, the charge was limited to Applewhite's claim for wrongful termination.

Applewhite asks the Court to consider her EEOC intake interview in addressing defendants' exhaustion defense. It is arguably "an open question in this circuit whether a pro se plaintiff is bound by a formal charge if critical information supplied to the agency was omitted." *Wojtanek v. Pactiv LLC*, 492 F. App'x 650, 652–53 (7th Cir. 2012). But the notes of Applewhite's intake interview reflect that it was almost entirely focused on the altercation with Cross and Applewhite's resulting termination. There is a brief reference to Applewhite's "doctor request[ing] a less hostile work environment when she returned to work" in February 2019 and a statement by Applewhite that she had been "stressed due to all the issues," Pl.'s Ex. 12. But the interview notes do not

9

suggest that Applewhite claimed she was subjected to an actionably hostile work environment or that she was denied an accommodation. In the Court's view, the brief comments in the intake interview are insufficient to tee up claims for failure to accommodate or for a hostile work environment. And the interview makes no mention at all of any claimed failure to train. Finally, Applewhite testified during her deposition that the EEOC charge—which, again, referenced *only* a claim for wrongful termination—"completely represent[ed] her allegations against IDHS." Applewhite Dep. at 48:1-4. Given this evidence, the Court concludes that Applewhite failed to exhaust any of her ADA claims other than her wrongful termination claim.

**C.     Claims against IDHS**

Defendants argue that IDHS is entitled to summary judgment on Applewhite's ADA termination claim because no reasonable juror could find that she was discriminated against based on her disability. First, defendants argue that Applewhite cannot show that she is disabled or a qualified individual. Second, defendants argue that IDHS had a legitimate, non-discriminatory basis for terminating Applewhite's employment.

     **1.     Qualified individual with a disability**

The ADA prohibits "discrimination against a qualified individual on the basis of disability." *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 995 (7th Cir. 2024) (internal quotation marks omitted). Defendants argue that Applewhite cannot show that she was disabled or a qualified individual at the time of her termination.

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of

10

such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A "major life activity" includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Defendants argue that because Applewhite's doctor permitted her to return to work without restrictions, she no longer had a disability at the time of her termination. That's ridiculous. A condition—including a psychiatric condition—does not have to directly impact an individual every waking hour before it counts as a disability. Though there is older caselaw suggesting that intermittent impairments do not qualify under the ADA, *see, e.g., Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995), the value of that precedent is significantly diminished by the 2008 amendments to the statute, which expanded the definition of disability to include "episodic" and "transitory" impairments if they substantially limit a major life activity when active. *See, e.g., Gogos v. AMC Mechanical Sys., Inc.*, 737 F.3d 1170, 1172-73 (7th Cir. 2013) (citing 42 U.S.C. § 12102(3)(B) & (4)(D)). Because there is evidence that Applewhite's mental health conditions substantially limit her life activities, including thinking, working, and concentrating, a reasonable jury could find that she is disabled within the meaning of the ADA.

Next, defendants argue that Applewhite is not a "qualified individual" under the ADA because she engaged in violent behavior contrary to the IDHS's anti-violence policy. To be a qualified individual under the statute, a plaintiff must "be able to perform the essential functions of her job with or without reasonable accommodation." *Li*, 110

F.4th at 995 (internal quotation marks omitted). Defendants do not dispute that Applewhite returned to work without any restrictions from her provider. They also do not dispute that, following her return from leave, Applewhite performed her duties without incident until the date of the altercation. And finally, defendants do not dispute that Applewhite returned to work and continued to perform her duties without incident even after the altercation for almost three months until she was terminated. This evidence is sufficient to permit a reasonable jury to find that Applewhite was a qualified individual.

Defendants correctly note that the ADA does not run in "favor of employees who commit or threaten to commit violent acts." *Palmer v. Cir. Ct. of Cook Cnty.*, 117 F.3d 351, 353 (7th Cir. 1997). In addition, "[v]iolation of a workplace rule, even if it is caused by a disability, is no defense to discipline up to and including termination." *Budde v. Kane Cnty. Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010). But the theory of Applewhite's case is that defendants were motivated to terminate her due to her disability and used her altercation with Cross as a pretext for terminating her employment, which the Court addresses in the section below. The defendants are not entitled to summary judgment on the basis that Applewhite was not a qualified individual in the first place.

### 2. Legitimate, nondiscriminatory reason; pretext

Defendants' primary contention is that Applewhite cannot prove discriminatory intent because they had a legitimate reason for terminating her employment—specifically, her initiation of workplace violence.

To make a *prima facie* case of discrimination under the often-used burden-shifting framework established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792

(1973), a plaintiff must show that (1) she is disabled, (2) was meeting her employer's legitimate employment expectations, (3) suffered an adverse employment action, and (4) "similarly situated employees without a disability were treated more favorably." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (internal quotation marks and citations omitted). If a plaintiff makes the required showing, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. If the employer does so, the burden shifts back to the employee to show that the employer's proffered reason is a pretext for discrimination. *See, e.g., Li*, 110 F.4th at 994.

The Court addressed the first part of the prima facie case test in the previous section, and the third part—adverse action—is plainly satisfied. The second and fourth parts of the test merge, because although Applewhite was found to have committed misconduct (and thus to have fallen short of IDHS's legitimate expectations), she contends that she was treated more harshly than similarly situated employees who were not disabled. *See, e.g., Orton-Bell v. State of Indiana*, 759 F.3d 768, 777 (7th Cir. 2014); *Lucas v. Chi. Transit Authority*, 367 F.3d 714, 728 (7th Cir. 2004). *See also, e.g., Jordan v. Evans*, No. 22-1316, 2024 WL 2271939, at *2 (7th Cir. May 20, 2024). And because IDHS's proffered reason for terminating Applewhite arises from the same misconduct allegations, these questions effectively merge with the question of whether IDHS's stated reason is pretextual. *See, e.g., Fredericks v. Adventist La Grange Mem. Hosp.*, 580 F. App'x 477, 478 (7th Cir. 2014); *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).

Applewhite cites as similarly situated Cross, the employee with whom she had

13

the altercation, and another IDHS employee, Levita Jones, who Applewhite contends was found to be the instigator of a workplace altercation, did not have a disability, and was not terminated. Regarding Jones, there is insufficient information to determine that a reasonable jury could find her similarly situated. The only evidence Applewhite cites regarding the Jones incident is relatively brief testimony by Rader during his deposition. Rader testified that the incident involved workplace violence and that he recommended Jones for termination, but the regional director of human resources did not accept the recommendation. But nothing in Rader's testimony—which is all that Applewhite cites regarding the Jones incident—indicates that Jones was found to have instigated the altercation. And Rader indicated that the ultimate determination by human resources not to terminate Jones's employment came after a number of witnesses recanted their original statements regarding the incident. *See* Rader Dep. at 28:12-30:9. Finally, there's no indication that the HR higher-ups who overruled Rader on terminating Jones had anything to do with Applewhite's termination, thus cutting against the proposition that IDHS's allegedly differential treatment of Jones is actually comparable to Applewhite's situation. Under the circumstances, there is insufficient evidence to permit a reasonable jury to find Jones similarly situated to Applewhite.

Applewhite also says that Cross is similarly situated but was not terminated. Defendants argue that Cross is not similarly situated because she was not the instigator of the violence—Applewhite was. The parties' dispute about this factor tracks their dispute over whether IDHS's stated basis for terminating Applewhite is pretextual, which is why this point merges with the pretext inquiry. The Court therefore proceeds to that issue.

14

"Pretext requires more than showing that the [employer's] decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Applewhite can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated [her] termination, or indirectly by showing that [IDHS's] explanations are unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (internal quotation marks omitted).

In this regard, the Court *does not* consider the labor arbitrator's 2021 decision upholding Applewhite's discharge. The arbitrator considered only whether there was just cause; there is no indication that the question of disparate application of IDHS's rules was at issue. Applewhite objects to consideration of the arbitrator's decision, and her point is likely well-taken.[3] The arbitrator's ruling is hearsay if offered to prove that IDHS had just cause. And there is no legitimate non-hearsay purpose to admit the ruling, as it came long after IDHS's decision to discharge Applewhite and thus could not possibly have any bearing on the relevant decision makers' state of mind when they approved her discharge. The arbitrator's decision theoretically could be admissible under Federal Rule of Evidence 803(8), but defendants do not argue that point and thus have forfeited it for present purposes. That aside, even if admissible under Rule 803(8), the decision would be subject to exclusion under Federal Rule of Evidence 403 as more

---

[3] *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), states that an arbitrator's just cause decision may be admitted in a suit involving employment discrimination, but it says the weight to be given to it depends on the circumstances, including whether the arbitrator's decision gave full consideration to the employee's statutory protection against discrimination. *Id.* at 60 n.21. There is no indication that occurred here. The arbitrator's decision did not address the question of discriminatory application of discipline. *See* Defs.' Ex. 13.

15

unfairly prejudicial than probative, as admission of the decision—which is premised upon determinations of the credibility of Applewhite and other key witnesses—effectively would usurp the role of the jury. One way or another, the Court does not consider the arbitrator's decision in addressing defendants' summary judgment motion.

Back to the issue of pretext. There is no question that instigation of workplace violence is a legitimate reason for discharge. Applewhite argues that IDHS got it wrong and that Cross was the aggressor and she simply defended herself. This argument is misplaced. In assessing pretext, the focus is on whether the employer's stated reason for its actions is honest, not whether it is well-reasoned, wise, or accurate. *See, e.g., Gates v. Caterpillar, Inc.* 513 F.3d 680, 691 (7th Cir. 2008). In other words, the question is whether the decision makers honestly believed that Applewhite had been the aggressor. No reasonable jury could find they did not. The decision makers were not present during the incident. The evidence is clear that they relied on the findings from the internal investigation, which concluded that Applewhite had initiated the violence by slapping and then hitting Cross. The Court cannot and does not say whether the investigation got it right, but the relevant point for present purposes is that there is no basis to say that the decision makers who approved Applewhite's discharge did not honestly believe she had initiated workplace violence.

Applewhite cites evidence that higher-ups had been looking for a reason to discharge her, but that does not provide a basis for a reasonable fact finder to doubt the veracity of IDHS's reliance on the internal investigation's findings (and Applewhite points to no evidence suggesting that the investigation itself was tainted). In other words, if Applewhite actually gave IDHS a legitimate basis to terminate her employment—as the

16

internal investigation concluded—the fact that this played into the hands of higher-ups is of no consequence.

The existence of a legitimate basis for termination would not end the inquiry if Applewhite had evidence that would permit a reasonable jury to find that other similarly situated non-disabled IDHS employees were let off with something short of termination. But as discussed earlier, Applewhite has offered no such evidence. All she points to is the Jones incident. As the Court has discussed, there is an insufficient basis on the record before the Court for a reasonable jury to find Jones's situation similar enough to Applewhite's to be comparable.

For these reasons, the Court concludes that no reasonable jury could find in Applewhite's favor on her ADA claim.

### 3. Totality of the evidence

Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), a court may forego the *McDonnell Douglas* burden-shifting analysis and instead consider the evidence "as a whole" to determine whether it would permit a reasonable fact finder to conclude that a proscribed factor—here disability—caused the plaintiff's discharge. Following an *Ortiz*-type analysis would not lead to any different result here. No reasonable jury could conclude that the decision makers who decided to terminate Applewhite's employment were motivated by her disability, as opposed to their belief that she had initiated violence in the workplace.

### D.    Claims against individual defendants

Defendants argue that the individual defendants are entitled to summary judgment on Applewhite's section 1983 claims. "Section 1983 creates a cause of action

17

against every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009) (internal quotation marks omitted). To "recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Id.* (internal quotation marks omitted).

Applewhite's section 1983 claim arises under the Equal Protection Clause of the Fourteenth Amendment. A governmental actor may not discriminate against an individual based on her disability without a rational basis. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 737 (7th Cir. 2000). But the Constitution requires a plaintiff to establish intentional discrimination. *See, e.g., Erickson v. Bd. of Govs. Of State Colleges and Univs. for Ne. Ill. Univ.*, 207 F.3d 945, 950 (7th Cir. 2000). Applewhite's wrongful termination claim against the individual defendants therefore fails for the same reasons discussed with respect to her ADA claim against IDHS; there is no evidence that would permit a reasonable jury to find that her disability motivated her discharge.

As for Applewhite's claims of failure to accommodate and failure to train, section 1983, unlike the ADA, does not require exhaustion of administrative remedies. But the Equal Protection Clause prohibits only discriminatory treatment; it does not include an affirmative accommodation requirement. *See, e.g., Arce v. Chi. Transit Authority*, 193 F. Supp. 3d 875, 893-94 (N.D. Ill. 2016), *aff'd*, 738 F. App'x 355 (7th Cir. 2018)

(collecting cases); *Terrell v. Benzel*, No. 22-CV-64, 2022 WL 1641145, at *3 (W.D. Wis. May 24, 2022). *See generally Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational.").

For these reasons, the individual defendants are entitled to summary judgment on Applewhite's section 1983 claims.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment [dkt. no. 151]. The Court directs the Clerk to enter judgment stating: This case is dismissed with prejudice.

Date: December 23, 2024

_____
MATTHEW F. KENNELLY
United States District Judge